THIS OPINION IS A
PRECEDENT OF THE TTAB

Oral Hearing:                                          Mailed:
   November 2, 2010                              April 27, 2011

**UNITED STATES PATENT AND TRADEMARK OFFICE**

———

**Trademark Trial and Appeal Board**

———

Hunt Control Systems, Inc.

v.

Koninklijke Philips Electronics N.V.

———

Opposition No. 91173417
to application Serial No. 79006105
filed on September 3, 2004

———

Luke Santangelo of Santangelo Law Offices, P.C. for Hunt
Control Systems, Inc.

David M. Kelly of Finnegan, Henderson, Farabow, LLP for
Koninklijke Philips Electronics N.V.

———

Before Quinn[1], Wellington, and Ritchie,
Administrative Trademark Judges.

Opinion by Wellington, Administrative Trademark Judge:

Koninklijke Philips Electronics N.V. ("applicant"), a

Dutch corporation, filed an application to register the mark

---

[1] Administrative Trademark Judge James T. Walsh participated in
the oral hearing held before the Board on November 2, 2010.  He
has since retired from the Board.  Judge Quinn has been
substituted for Judge Walsh as a member of the panel deciding
this case.  The change in composition of the panel does not
necessitate a rehearing of the oral argument.  *See*, *In re Bose*,
772 F.2d 866, 227 USPQ 1, 4 (Fed. Cir. 1985).

SENSE AND SIMPLICITY (in standard character format) for goods in four different international classes, including a lengthy identification of goods in International Class 9.[2]

Hunt Control Systems, Inc. (hereinafter, "opposer") has opposed registration of applicant's mark, but only in regard to certain goods in International Class 9, namely, "electrical light dimmers, electrical circuit boards, printed circuit boards, electrical circuits for electrical conduction, printed circuits, [and] electrical controllers."[3] As its ground for opposition, opposer alleged that Hunt Control Systems, Inc. is an "assumed trade name of Caribe Corporation" which is the owner of application Serial No. 76596112 for the mark SIMPLICITY;[4] that "since at least March 15, 1994, [opposer] has been, and is now, using the mark SIMPLICITY in connection with the sale of electrical light dimmers and lighting control

---

[2] Application Serial No. 79006105 is a request for an extension of protection, based on an international registration, under Section 66(a). For USPTO purposes, the application has been accorded a priority date of May 27, 2004, under Section 67.

[3] Opposer's contention that the scope of its opposition is broader than this list will be discussed infra.

[4] Since the filing of the notice of opposition, the application matured into Registration No. 3254393 (issued on June 26, 2007) covering the goods: "industrial and commercial electrical lighting control panels." The record establishes that the owner of the registration, Caribe Corporation, is the holding company for opposer, and that the two are separate legal entities. Glaser Dec. 2:6-9; Certified status and title copy of the registration was submitted under notice of reliance and is identified as Trial Exhibit 9.

panels" and that said use "has been valid and continuous...and has not been abandoned"; and that applicant's mark and goods "so resembles Opposer's mark SIMPLICITY, that has been previously used in the United States for electrical light dimmers, electrical control panels and their related components, and not abandoned, as to be likely to cause confusion, or to cause mistake, or to deceive."

In its answer, applicant admitted that opposer has "made use" of its SIMPLICITY mark, but otherwise denied the other allegations in the notice of opposition.

<u>Scope of the Proceeding and Preliminary Matters</u>

Several issues have been raised by motion during the trial and briefing of this proceeding that require attention before we can address the record and the merits of the opposition. Specifically, the parties dispute the extent of the goods in applicant's application that are the subject of this opposition; the scope of opposer's goods that were pleaded and should be considered for purposes of a likelihood of confusion analysis; and the relevance of opposer's pleaded application and resulting registration.

A. *Madrid Applications and Scope of Opposed Goods*

The opposed application is a request for an extension of protection under the Madrid Protocol, based on an international registration, under Section 66(a), 15 U.S.C. §

1141 of the Trademark Act.  Applications filed under Section 66(a), often referred to as "Madrid applications," are treated differently in many key respects from other applications.  To fulfill its obligations under the Madrid Protocol, the USPTO has promulgated regulations to accommodate the particular aspects of these applications. See Rules of Practice for Trademark-Related Filings Under the Madrid Protocol Implementation Act, 68 Fed. Reg. 55, 747 (Sept. 26, 2003); see also, *In re Börlind Gesellschaft für kosmetische Erzeugnisse mbH*, 73 USPQ2d 2019 (TTAB 2005), for additional discussion.  For example, Trademark Rule 2.101(b)(2) provides that any opposition to a Section 66(a) application must be filed through the USPTO ESTTA electronic filing system.  Further, Rule 2.107(b) provides that, "pleadings in an opposition proceeding against [a 66(a) application]... may not be amended to add to the grounds for opposition or to add to the goods or services subject to opposition."  The impetus behind the aforementioned rules is that the USPTO must promptly inform the International Bureau of the World Intellectual Property Organization of the institution of the opposition against the Madrid application.  Accordingly, ESTTA requires the opposer of a Madrid application to provide essential information involving the opposition including, *inter alia*, the specific

goods and/or services in the application it is opposing,[5] the ground(s) for opposition, and the application or registration number for any mark owned by the opposer and cited as a basis for the opposition. ESTTA then generates an opposition form entitled "Notice of Opposition" that lists, among other items, the information provided by the opposer. This form, along with any attached supplementary elaboration of the basis for the opposition, serves as the complaint in the opposition proceeding. *PPG Industries Inc. v. Guardian Industries Corp.*, 73 USPQ2d 1926, 1928 (TTAB 2005)(ESTTA-generated opposition form is an integral part of the pleading). The USPTO's automated systems automatically forward the information included in the Section 66(a) application and the ESTTA opposition form to the International Bureau.

As to the scope of the goods being opposed, the instant opposition to the involved Section 66(a) application necessarily is limited to the six specific goods identified

---

[5] After confirming that the application is ripe for opposition, ESTTA presents the opposer with the option of identifying the goods and/or services that it seeks to oppose. For each and every class in the application, the opposer must choose whether it is opposing all, none, or some of the goods and/or services. If the opposer chooses to oppose some, but not all of the items in the class, it may edit (by "deletions only") the identification(s) of goods and services so that only the opposed goods or services remain.

When opposer herein completed the ESTTA opposition filing, it identified the opposed goods by deleting all of the goods in International Class 9, but for six items, and checked "none" (no goods being opposed) with regard to the application's other two international classes of goods.

on the ESTTA opposition form and referenced at the beginning of this decision. Again, these goods are: electrical light dimmers, electrical circuit boards, printed circuit boards, electrical circuits for electrical conduction, printed circuits, and electrical controllers in International Class 9. Opposer argues that the scope of the opposed goods is wider because, in the supplementary explanation of the basis for the opposition that was attached to the ESTTA opposition form, opposer specifically recites the same six goods and adds to such recitation "and related products in International Class 9" as constituting the objectionable goods.

Although we must consider both the ESTTA-generated notice of opposition form and opposer's attached notice of opposition as constituting the entire operative complaint, opposer may not rely on the language "and related products" in the latter attachment to include in its opposition goods that were not specifically identified in the former, i.e., the ESTTA-generated notice of opposition form. In other words, with respect to Section 66(a) applications, all oppositions must be confined to the opposed goods identified by opposers on the ESTTA-generated opposition forms. All pertinent information regarding oppositions sent to the International Bureau is ascertained solely from the ESTTA-generated notice of opposition and the application itself.

6

That is why Office rules require an opposition to a Section 66(a) application to be filed via ESTTA and preclude the opposer from amending the scope of the opposed goods.

We see no perceived or actual unfairness to opposer in limiting the opposition to those six items specified on the ESTTA-generated notice of opposition. Opposer, on its own, took the affirmative step of identifying International Class 9 as the only class being opposed and took the additional step of deleting all of the goods, but for the six specified items (see footnote 5). Thus, any argument that the language "and related products" should somehow include goods that opposer previously deleted is specious, at best. Simply put, for an opposition against a Section 66(a) application, the Board will not allow an opposer, in an attachment to the ESTTA form, to add to the goods listed in the ESTTA-generated notice of opposition form. To allow an opposer to do so would violate the purpose of Rule 2.107(b), and would result in an opposition impermissibly broader in scope than noted in the information provided by the USPTO to the International Bureau, contrary to the USPTO's obligations under the Madrid Protocol.

B. *The Scope of Opposer's Goods*

Applicant argues that opposer's asserted common law rights in its SIMPLICITY mark should be limited to "lighting control panels and electrical light dimmers" for purposes of

7

this opposition.  As previously noted, opposer pleaded common law rights in its mark based on prior use of the mark for those goods, <u>as well as</u> "their related components." Applicant asserts that the latter language is "ambiguous" and "gave [applicant] neither 'fair notice' nor 'sufficient detail' of the basis for [opposer's] claim of common law rights."  Brief, p. 31.  We disagree and, to the extent that opposer has shown that it has prior use on goods that are "related components" of lighting control panels or electrical light dimmers, find that opposer may rely on use of the mark for said goods for purposes of establishing a likelihood of confusion.

Inasmuch as lighting control panels and electrical light dimmers are sufficiently clear in their description, we do not see how the meaning of "related components" of these goods is lost on applicant.  Had applicant believed that the wording "and their related components" was not sufficiently clear, it could have taken discovery in this regard or filed a motion for a more definite statement under Fed. R. Civ. P. 12(c).  Applicant did not file such a motion and, at least at the pleading stage of this proceeding, appeared to have had no problem with such language because it used the same wording ("and their related components") in its answer to deny opposer's allegations.  See Answer, paragraph 7.

8

Accordingly, we find the opposition encompasses opposer's asserted common law rights in its SIMPLICITY mark for the related components of lighting control panels or electrical light dimmers.  Of course, opposer must establish that these "related components" are indeed related to the specified goods, in addition to establishing its common law rights in the goods and components.

C.  *Opposer's Pleaded Application/Registration*

Applicant objects to opposer's reliance upon the SIMPLICITY registration that matured from the pleaded application.  We agree that opposer may not rely on the registration, but not for the reasons raised by applicant.[6] That is, opposer's holding company Caribe Corporation is the

---

[6] For sake of completeness, applicant's stated objections are not well-taken.  Applicant was clearly put on notice that opposer sought to rely on the application that later matured into a registration and applicant had an opportunity to object to issuance of a registration, either by way of a notice of opposition when the mark in the application was published, or by way of a counterclaim for cancellation once the registration issued.  See *UMG Recordings Inc. v. O'Rourke*, 92 USPQ2d 1042, 1045 n.12 (TTAB 2009)("The pleading of the application … provided sufficient notice to the applicant that the opposer would rely on a registration from the application for its likelihood of confusion claim.")  Moreover, it is clear that once a registration based on the pleaded application issued to opposer and was not contested by applicant, priority would not be an issue in this case with respect to the goods covered by said registration.  *Id.* ("while an opposer that pleads ownership of an application would have to make any subsequently issued registration of record, it would not have to amend its notice of opposition prior to doing so); see also, *King Candy Co. v. Eunice King's Kitchen, Inc.*, 496 F.2d 1400 (CCPA 1974)(noting that Section 2(d) of the Act provides that an applicant may not register its mark unless it causes confusion with "a mark registered in [the USPTO], or ...previously used."  15 U.S.C. § 1052(d), emphasis added.)

named owner of the registration (see footnote 4) as reflected by USPTO records, and the presumptions afforded by Section 7(b) of the Trademark Act, 15 U.S.C. §1057, do not inure to opposer; opposer may not rely on said registration for purposes of priority.  See *Chemical New York Corp. v. Conmar Form Systems, Inc.*, 1 USPQ2d 1139, 1144 (TTAB 1986) (wholly-owned subsidiary of owner of registrations may not rely on registrations to prove priority); *Yamaha International Corp. v. Stevenson*, 196 USPQ 701, 702 (TTAB 1979) (opposer could not rely on 7(b) presumptions where registration is owned by its parent company); *Fuld Brothers, Inc. v. Carpet Technical Service Institute, Inc.*, 174 USPQ 473, 475-76 (TTAB 1972) (although petitioner can rely on its wholly-owned subsidiary's use of a mark, petitioner cannot rely on the registrations owned by its wholly-owned subsidiary for statutory presumptions); and *Joseph S. Finch & Co. v. E. Martinoni Co.*, 157 USPQ 394, 395 (TTAB 1968) (opposer cannot rely on registrations owned by its parent or its parent's subsidiaries). See also TBMP 704.03(b)(1)(B) (2d ed. rev. 2004).

Although opposer may not rely upon the registration for the above-mentioned purposes, the registration remains part of the record.

We would be remiss if we did not point out that our findings above in sections (B) and (C) are not outcome

determinative with respect to the likelihood of confusion ground. Opposer's inability to rely upon the pleaded registration is not crucial in view of applicant's acknowledgment, in its brief and at oral hearing, that opposer has established prior common law rights in its mark, SIMPLICITY, on "lighting control panels and electrical light dimmers." See Applicant's Brief at p. 32. Opposer's prior common law rights in its mark for these goods are conceded by applicant. Moreover, because opposer's prior common law rights cover goods that are identical to certain goods being opposed, *i.e.*, electrical light dimmers and controllers, we focus on these goods for purposes of our likelihood of confusion analysis and we need not also make determinations regarding the similarity or dissimilarity of any of opposer's other pleaded goods vis-à-vis the other opposed goods in the application. Similarity between *any* of the opposer's goods and any of the opposed goods will suffice as a basis for purposes of the second *du Pont* factor, and dictates refusal as to all of the opposed goods in the class, should the ultimate conclusion in the case be that a likelihood of confusion exists. *See Tuxedo Monopoly, Inc. v. General Mills Fun Group,* 648 F.2d 1335, 209 USPQ 986, 988 (CCPA 1981).

Record

The record includes the pleadings and, by operation of Trademark Rule 2.122(b)(1), the file of the opposed application.

On April 30, 2009, the parties filed a stipulation to the authenticity of documents produced, allowing each party that obtained documents in discovery from the other party under Fed. R. Civ. P. 34 to make said documents of record by notice of reliance alone.  And, on May 29, 2009, the parties filed a second stipulation permitting the introduction of testimony in affidavit or declaration form (within certain guidelines set forth in the stipulation).

During its testimony period, opposer filed the testimonial declaration of Alan John Glaser, president of Caribe Corporation, a holding company and owner of opposer. Exhibits referenced in the Glaser declaration, and various other documents and materials, including portions of the discovery depositions of applicant's witnesses Geert Van Kuyck and Terry A. Fassburg, were submitted under numerous notices of reliance.[7]  Opposer also filed the declaration of Dan Hoffman, principal and founder of Market Perspective.

Applicant has submitted the testimonial declarations, some with exhibits, of the following persons:  Terry A.

---

[7] The proper procedure for filing trial deposition exhibits is to submit them with the copy of the transcript being filed.

12

Fassburg, Vice President for Corporate Communication at Philips Electronics North America Corporation (a subsidiary of applicant); Mary Beth Walker, counsel for applicant;[8] Geert Van Kuyck, Chief Marketing Officer for applicant; Michael B. Mazis, Ph.D., Professor Emeritus of Marketing at American University's Kogod School of Business; Carolyn C. Kerr, Director of Marcom and Brand for Philips Lighting Company, a subsidiary of applicant; Steven K. Claremon, litigation clerk for applicant's counsel; Scott T. Harlan, an attorney at applicant's counsel's law firm; April E. Reeves, litigation clerk for applicant's counsel; and Edward W. Goodman, Senior IP Counsel for Philips Electronics North America Corporation. In addition, applicant filed the cross-examination testimony of Mssrs. Hoffman and Glaser, with exhibits. Under notices of reliance, applicant submitted copies of the following: dictionary definitions, certain responses from opposer to applicant's discovery requests, USPTO electronic database printouts of third-party registrations and applications, excerpts from the discovery deposition testimony of Mr. Glaser and, pursuant to Rule 2.120(j)(4), excerpts from the discovery depositions of its witnesses Messrs. Fassburg and van Kuyck.

---

[8] Applicant submitted several declarations of Ms. Walker during the course of this proceeding. The two testimonial declarations, filed November 4, 2009, involve "inspection of opposer's document production" and "internet evidence."

In its rebuttal testimony period, opposer submitted a "rebuttal" declaration of Mr. Glaser; non-confidential excerpts from Mr. Glaser's discovery deposition to "provide context to and further explain the portions of the deposition evidence submitted by [applicant]"; and copies of printouts from applicant's website and news articles.

Opposer and applicant have filed trial briefs, including a reply brief from opposer.

<u>Applicant's Evidentiary Objections and Motions to Strike</u>

Applicant has filed several motions to strike and otherwise raised numerous objections to certain evidentiary submissions from opposer.  Many of these objections are overruled or otherwise rendered moot based on the reasoning and holdings discussed above.  Applicant's objection to opposer's reliance on Registration No. 3254393 is sustained because opposer is not the owner of said registration. Applicant also objects to opposer's reliance on testimony and evidence pertaining to goods of applicant that are not specifically opposed in the notice of opposition, *e.g.*, light bulbs.  Applicant argues that the testimony and evidence is irrelevant and thus inadmissible under Fed. R. Evid. 402.  Although opposer submitted testimony and evidence involving applicant's goods that are not being opposed, we decline to strike this testimony or exhibits on that basis in this proceeding.  Without losing sight of

applicant's specific goods that are the subject of this opposition, we simply accord the evidence whatever probative value it deserves, if any at all. In similar fashion, we decline to strike other evidence submitted by opposer, including a business survey conducted by opposer itself, Mr. Glaser's testimony regarding purported instances of actual confusion, and other documents and internet printouts. Ultimately, the Board is capable of weighing the relevance and strength or weakness of the objected-to testimony and evidence in this specific case, including any inherent limitations, and this precludes the need to strike the testimony and evidence. Given the circumstances herein, we choose not to make specific rulings on each and every objection. As necessary and appropriate, we will point out in this decision any limitations applied to the evidence or otherwise note that the evidence cannot be relied upon in the manner sought. Ultimately, while we have considered all of the evidence and arguments of the parties, we have primarily relied on the evidence discussed herein.

Finally, we address opposer's reliance on evidence and testimony that derives from or pertains to the parties' communications in attempting to settle this matter. Applicant objects to any reliance upon this evidence, citing to Fed. R. Evid. 408 (prohibiting, with exceptions, use of "conduct or statements made in compromise negotiations").

In response to the objection, opposer states that this evidence was "offered only to counter [applicant's] claim that [applicant] was unaware of what [opposer] claimed to be 'related products' until it received [opposer's] trial brief." Reply Brief, p. 20. Inasmuch as the scope of the opposed goods has been resolved for reasons wholly unrelated to this evidence, opposer's stated sole purpose for relying upon this evidence has been negated. We have not considered this evidence.

## Standing and Priority

Opposer has established its standing in this proceeding through the testimony of Mr. Glaser that opposer is in the business of selling various electrical lighting control products bearing the SIMPLICITY mark.

As previously alluded to, opposer has established through the trial declaration testimony of Mr. Glaser that opposer, and its predecessor-in-interest, has used the SIMPLICITY mark on goods that include lighting control panels and electrical light dimmers since at least 1986. Glaser Dec. at 3-6. Again, applicant has conceded this use and opposer's priority with respect to those specific goods. Applicant's Brief, p. 32 ("The evidence of record establishes that prior to [applicant's] priority date for its SENSE AND SIMPLICITY Application, Hunt had sold only

16

lighting control panels and electrical light dimmers in connection with its SIMPLICITY mark.")

<u>Likelihood of Confusion</u>

Our determination of the issue of likelihood of confusion is based on an analysis of all of the probative facts in evidence that are relevant to the factors set forth in *In re E. I. du Pont de Nemours & Co.*, 476 F.2d 1357, 177 USPQ 563 (CCPA 1973). See also, *In re Majestic Distilling Co., Inc.*, 315 F.3d 1311, 65 USPQ2d 1201 (Fed. Cir. 2003).

We initially address the *du Pont* factors involving the similarity or dissimilarity of opposer's goods in relation to applicant's goods being opposed, their channels of trade, and the conditions of purchase. As to the goods themselves, we have already pointed out that the parties' goods are in part legally identical. Opposer's electrical light dimmers are the same as those opposed in the subject application and applicant admits this in its brief at p. 42 ("one product from [applicant's] SENSE AND SIMPLICITY application, 'electrical light dimmers,' is identical to one of [opposer's] products.") Furthermore, applicant's "electrical controllers" is a broad term encompassing opposer's lighting control panels and, as a result, the respective goods are legally identical.

As to the trade channels and purchasers of the goods, opposer has established through the Glaser trial declaration

17

and testimony, with exhibits, that opposer's products range in use from "residential, commercial, and industrial wall box controls and switch controls all across the spectrum of lighting sources." Glaser Dec. 17:12-14. Referencing one of opposer's websites, Mr. Glaser testified that the type of purchaser for the goods on the website "runs the gamut of our lighting industry" and would include "at the professional level...a specifier, an architect, or an engineer that might want to purchase or perhaps to specify the item, so they could be here looking for more information to make a decision on which item that they think would best fit their client's needs and so then to specify the item." Glaser Dec. 14:5-9. In addition, the purchaser "could range from a commercial building owner to a homeowner. A broad type of purchaser or consumer can be involved in [opposer's] lighting industry." Glaser Dec. 14:17-18. To reach its customers, opposer advertises its products through various outlets, including trade shows, press releases and trade magazines.

As to the commonality of the trade channels and purchasers, opposer has shown that applicant has had a presence at several of the same trade shows. Glaser Dec. at 26, 31-33 (with various related exhibits). Opposer and applicant, through its subsidiaries, are also charter members of the Lighting Controls Association, an industry

18

consortium seeking to "grow the lighting controls industry through education."  Glaser Dec. 4:20-5:3.  Moreover, because there are no restrictions or limitations in applicant's description of goods, we must assume that applicant's electrical light dimmers and electrical controllers are sold in all of the normal trade channels for such goods and to all of the normal purchasers for such goods, including opposer's channels of trade and purchasers as demonstrated by the record.

Accordingly, in view of our finding that the parties' goods are identical in part, have the same channels of trade, and are sold to the same purchasers, these *du Pont* factors all support a determination that a likelihood of confusion exists.

Although we have concluded that the classes of purchasers are the same, we must also consider the conditions under which the goods are likely to be purchased, e.g., whether on impulse or after careful consideration, as well as the degree, if any, of sophistication of the consumers.  In this regard, we have noted often that merely because the goods are expensive or purchased after careful deliberation does not mean that the purchasers are sophisticated in trademark matters, or that confusion would therefore be avoided.  Even consumers who exercise a high degree of care are not necessarily knowledgeable regarding

19

the trademarks at issue, and therefore immune from source confusion. *In re Wilson,* 57 USPQ2d 1863, 1865-66 (TTAB 2001); *In re Decombe,* 9 USPQ2d 1812, 1814-1815 (TTAB 1988) ("Being knowledgeable and/or sophisticated in a particular field does not necessarily endow one with knowledge and sophistication in connection with the use of trademarks.").

Applicant points to the testimony of opposer's witness, Mr. Glaser, and argues that opposer's customers are "highly sophisticated and make purchases only after careful consideration." Brief, p. 23. On cross-examination, Mr. Glaser did state that the purchasers of its larger and more expensive "systems" were commercial users, but he further testified that opposer also markets "components" such as lighting and dimming controls that are less complicated, less expensive and for residential use. Glaser Cross 159:10-164:12. These goods include the type of electric lighting and dimming controls that may be purchased by individual homeowners at the retail store level. Glaser Cross 160:21-162:13. Thus, while some of opposer's customers may be considered sophisticated, this is not true for all products and we cannot conclude that the non-sophisticated consumers constitute a de minimis number. Accordingly, we must consider the customers who will be exercising only the usual amount of care or diligence when

purchasing goods such as the electric lighting and dimming controls.

We turn then to the *du Pont* factor concerning the similarity or dissimilarity of the marks when viewed in their entireties in terms of appearance, sound, connotation and commercial impression. *See Palm Bay Imports, Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772*, 396 F.3d 1369, 73 USPQ2d 1689 (Fed. Cir. 2005). In doing so, we have also considered applicant's arguments directed to what it believes is the lack of strength of opposer's SIMPLICITY mark. Finally, we also keep in mind that when marks would appear on identical goods, as they do in part here, the degree of similarity between the marks necessary to support a finding of likelihood of confusion declines. See *Century 21 Real Estate v. Century Life*, 970 F.2d 874, 23 USPQ2d 1698 (Fed. Cir. 1992).

The obvious similarity in appearance and sound between the parties' marks stems from the fact that applicant's proposed mark, SENSE AND SIMPLICITY, incorporates opposer's previously used and registered mark, SIMPLICITY, in its entirety.

In cases such as this, a likelihood of confusion has frequently been found. "When one incorporates the entire arbitrary mark of another into a composite mark, the inclusion of a significant, non-suggestive element will not

21

necessarily preclude a likelihood of confusion. [Internal citations omitted]. An inclusion of a merely suggestive or descriptive element, of course, is of much less significance in avoiding a likelihood of confusion." *The Wella Corp. v. California Concept Corp.,* 558 F.2d 1019, 194 USPQ 419, 422 (CCPA 1977) (CALIFORNIA CONCEPT and surfer design is similar to the mark CONCEPT). *See also Coca-Cola Bottling Co. v. Seagram & Sons, Inc.,* 526 F.2d 556, 188 USPQ 105, 106 (CCPA 1975) (BENGAL LANCER and Bengal Lancer soldier design is similar to the mark BENGAL); *In re Bissett-Berman Corp.,* 476 F.2d 640, 177 USPQ 528, 529 (CCPA 1973) (E-CELL is similar to the mark E). Nevertheless, it is often pointed out that there is no absolute rule and exceptions have been made when the additional matter was found sufficient to distinguish the marks under circumstances where the marks in their entireties convey significantly different meanings or commercial impressions or the incorporated matter has been so merged with the other matter that it "loses its separate identity." See, e.g., *Castle & Cooke, Inc. v. Oulevay, S.A.,* 370 F.2d 359, 152 USPQ 115 (CCPA 1967) (FARANDOLE not confusingly similar to DOLE for related food products because DOLE is so merged into FARANDOLE that it loses its individual identity therein). See also, *Lever Brothers Company v. The Barcolene Company*, 463 F.2d 1107, 174 USPQ 392 (CCPA 1972) (mark ALL CLEAR! not confusingly similar to

22

ALL); and *Colgate-Palmolive Co. v. Carter-Wallace, Inc.*, 432 F.2d 1400, 167 USPQ 529 (CCPA 1970) (no likelihood of confusion found between marks PEAK for dentifrice and PEAK PERIOD for personal deodorant).

Applicant offers several arguments why it believes, despite the fact it has incorporated opposer's SIMPLICITY mark, "the differences between the two marks dictate a finding a finding of no likelihood of confusion." Brief, p. 35. First, applicant argues that the term "simplicity" is "highly suggestive, laudatory, and weak, and thus is only entitled to a narrow scope of protection." Id. at 32. In support, applicant relies on several dictionary definitions showing that "simplicity" means, "[t]he property, condition, or quality of being simple or uncombined."[9] In addition, applicant relies on the parties' own usage of their respective marks as well as 58 third-party registrations for marks that include SIMPLICITY (or the phonetic equivalent thereof) and 30 more for marks containing a SIMPL-formative term.[10] While numerous, these third-party registrations cover a very broad range of goods and/or services; to wit, the first three registrations submitted are, respectively,

---

[9] American Heritage College Dictionary (3d edition, 2001); submitted by applicant under its notice of reliance no. 1 (filed November 4, 2009). Additional dictionary entries for the same term were also submitted.

[10] Submitted by applicant under its notice of reliance no. 2 (filed November 4, 2009).

for "water treatment chemicals for use in swimming pools and spas," "wood stains" and "face cleansers…." Nevertheless, several of the registered marks are for electrical controllers or related goods. Of most relevance are the following:

SIMPLY BRILLIANT for automated lighting controllers, not for sale in retail hardware stores;[11]

SIMPLICITY for electric controllers for heating, ventilation, and air conditioning units in commercial use;[12]

SIMPLE CONTROL (stylized with design) for home and office automation systems comprising wireless and wired controllers, controlled devices, and software for lighting, HVAC, security, safety and other home and office monitoring and control applications;[13]

SIMPLEREMOTE for, inter alia, electronic remote control units and systems comprising computer hardware, operating software, application software, networking software, and handheld devices for the control and automation of electronic, audio, video, lighting, security, and environmental equipment, apparatus and appliances, namely, players and recorders for PVRs/DVRs, CDs, DVDs, video cassettes, audio cassettes, mini-discs players and MP3 files, amplifiers, loud speakers, headphones, earphones, television sets, radio sets, telephones for transmission of data through the Internet and other networks, cameras and monitoring systems for activating and controlling heating, ventilation, and air conditioning systems;[14] and

SIMPLE SYNCHRONOUS for power supply controllers and manuals sold therewith as a unit.[15]

---

[11] Registration No. 3163623.

[12] Registration No. 2602798.

[13] Registration No. 3475205.
[14] Registration No. 3245563.

[15] Registration No. 2988287.

While the third-party registrations are not evidence that the registered marks are actually in use, they may be given some weight to show the meaning of a mark, or a term in the mark, in the same way that dictionaries are used. *In re Box Solutions Corp.,* 79 USPQ2d 1953, 1955 (TTAB 2006) ("[T]hird-party registrations can be used in the manner of a dictionary definition to illustrate how a term is perceived in the trade or industry"). *See also In re J.M. Originals Inc.,* 6 USPQ2d 1393, 1394 (TTAB 1987) ("[T]hird party registrations are of use only if they tend to demonstrate that a mark or a portion thereof is suggestive or descriptive of certain goods and hence is entitled to a narrow scope of protection").

In this case, we find that the existence of numerous registrations for marks containing SIMPLICITY or SIMPLE-formative terms indicates that such terms lend themselves for adoption in trademarks for a variety of goods and services because they serve to suggest that the goods sold under that mark may be "simple" in design and thus may be easier to utilize, install, understand, etc. Such suggestiveness is corroborated by the parties' own advertisements that highlight the "simple" or "easy-to-operate" features of their goods. For example, opposer touts its SIMPLICITY-branded goods as "simple" or "simple-

25

to-install."[16]  At the same time, we note that very few of the third-party registrations submitted cover goods that are closely related to opposer's electrical light dimmers and lighting controls.  And, for those few registrations which do, opposer's mark SIMPLICITY is not the same as the SIMPLE-formative term employed in the marks.

We agree with applicant to the extent that opposer's mark, SIMPLICITY, is suggestive and thus may not be entitled to the wide scope of protection that we would normally accord a non-suggestive, stronger mark; however, this is not fatal to the likelihood of confusion ground.  It has often been emphasized that even weak marks are entitled to protection against confusion.  *King Candy,* 182 USPQ at 109 ("likelihood of confusion is to be avoided, as much between 'weak' marks as between 'strong' marks, or as between a 'weak' and 'strong' mark.").

In considering the marks in their entireties, as we must, we do not disregard the additional term SENSE in applicant's mark, SENSE AND SIMPLICITY.  Applicant contends that the term SENSE is "ambiguous" and, because it appears first, it forms the dominant element of applicant's mark, thus serving to distinguish the two marks.

We agree with applicant that, in general, distinctive terms appearing first in marks are more likely to play a

---

[16] See, *e.g.*, Glaser Dec. exhibits 1-3, 5, 10, and 14-15.

prominent role in forming a commercial impression than any latter, less distinctive terms.  We disagree, however, with applicant in its assertion that the term "sense" is ambiguous.  Rather, we believe that consumers are likely to understand "sense" as being suggestive of the products' practicality in that the goods "make sense."  In the same manner that the parties' advertisements play on the suggestive nature of the term "simplicity," applicant's advertisements containing the SENSE AND SIMPLICITY mark also highlight the suggestive value of the term "sense."  For example, alongside its mark SENSE AND SIMPLICITY, applicant's advertisements for a variety of products contain the text:[17]

> ...Simplicity can be the goal of technology.  It certainly is the goal at Philips.  It just makes sense.
>
> ...Now doctors can see just what they need to see...at the push of a button, which could be the difference between life and death.  It just makes sense.
>
> ...You don't just see what's on the screen, you see beyond the edges of it.  It's an experience more like life and not at all like ordinary television.  You've never seen anything like it.  It just makes sense.
>
> ...Hospitals can be frightening places, so to help patients relax and let doctors get their work done more easily, it make sense to let patients decide what they want to see around them...

These examples illustrate the suggestive nature of the term "sense" in connection with a variety of goods.

---

[17] Fassburg Decl. Ex. Nos. 2 and 7.

27

Consumers likewise would perceive the same meaning from the term in connection with electric controllers or light dimmers. And, while we cannot conclude that the term "sense" is as equally suggestive as "simplicity," it does connote a "practical" quality or "makes sense" value to the goods being advertised.

Bearing in mind the suggestiveness of the terms "simplicity" and "sense," the overall commercial impressions or connotations created by the marks in their entireties are not so different. Opposer's mark connotes goods possessing simple-construction or an easy-to-use quality; applicant's mark shares the same connotation with the additional connotation that the goods "make sense" or are practical in nature.

Applicant has also argued that SENSE AND SIMPLICITY is a "unitary mark that creates a strong and distinctive commercial impression." Brief, p. 36. While the alliteration employed in applicant's mark may assist consumers' perception of the mark as a combination of both terms rather than just focusing on one, we find no separate distinct overall commercial impression as a result. Applicant's mark will still be perceived as the combination of the two terms and, as explained above, imparts a meaning that the goods advertised under the mark are practical and simplistic in design and/or easy to use. The combination of

28

the terms SENSE and SIMPLICITY does not alter the connotation of either of those terms. Together they retain the same respective meanings as separate terms.

Ultimately, we cannot conclude that opposer's SIMPLICITY mark is so suggestive and entitled to such a narrow scope of protection that consumers will easily differentiate applicant's SENSE AND SIMPLICITY mark, when used on identical goods. In sum, we find that this *du Pont* factor weighs in favor of finding a likelihood of confusion.

Several other *du Pont* factors were argued by the parties in their briefs. However, we find that either the parties failed to submit sufficient evidence to substantiate the arguments or the factors simply remain neutral in our likelihood of confusion analysis. In particular, we note that opposer contends that instances of actual confusion have occurred, whereas applicant points to nearly six years of concurrent use without any instances of actual confusion as a strong indicator that there is no likelihood of confusion. Here, opposer's evidence in support of instances of actual confusion consists essentially of Mr. Glaser's testimony that he was approached at several trade shows regarding incorrect assumptions that opposer was affiliated with applicant. Mr. Glaser, however, admitted that he is not able to provide the names or companies that were purportedly confused based on the parties' use of their

29

respective marks. Nevertheless, we acknowledge that evidence of actual confusion is difficult to find and it is well settled that evidence of actual confusion is not required in order to establish likelihood of confusion. See *Herbko International Inc. v. Kappa Books Inc.*, 308 F.3d 1156, 64 USPQ2d 1375 (Fed. Cir. 2002); and *Weiss Associates, Inc. v. HRL Associates, Inc.*, 902 F.2d 1546, 14 USPQ2d 1840 (Fed. Cir. 1990). Under the circumstances, we find that even the lack of any evidence of actual confusion would not establish that confusion would not be likely to occur from the contemporaneous use of these marks.

## Conclusion

Having found that the marks are similar, that the goods are identical in part, and that we must presume that said goods move in the same trade channels and are available to the same classes of purchasers, we find that applicant's mark SENSE AND SIMPLICITY is likely to cause confusion with opposer's mark SIMPLICITY when used on those goods. To the extent that any doubts might exist as to the correctness of our likelihood of confusion conclusion, we resolve such doubts against applicant. *See Century 21 Real Estate Corp., supra; Ava Enterprises Inc. v. Audio Boss USA Inc.*, 77 USPQ2d 1783 (TTAB 2006); and *Baseball America Inc. v. Powerplay Sports Ltd.*, 71 USPQ2d 1844 (TTAB 2004).

**Decision**: The opposition is sustained and registration is refused to applicant as to the opposed goods in International Class 9, namely, electrical light dimmers, electrical circuit boards, printed circuit boards, electrical circuits for electrical conduction, printed circuits, and electrical controllers. The application will be forwarded for issuance of a registration as to the remaining goods in International Class 9 and the other three classes.